**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| TANAJAE RAYCHELLE WALLACE | ) | |
| FOR JOHN RAY WALLACE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 13-218 |
| | ) | |
| v. | ) | Judge Mark R. Hornak |
| | ) | Magistrate Judge Susan Baxter |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I.      RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary

Judgment (ECF No. 9), grant Defendant's Motion for Summary Judgment (ECF No. 11), and

affirm the decision of the administrative law judge ("ALJ").

## II.      REPORT

### A.      BACKGROUND

#### 1.      Procedural History

Tanajae Raychelle Wallace, for John Ray Wallace ("Plaintiff")[1] brings this action

pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner

of Social Security ("Defendant" or "Commissioner") denying his applications for Disability

Insurance Benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of

the Social Security Act, 42 U.S.C. § 401, *et seq*. and § 1381 *et seq*. ("Act").  Plaintiff filed for

---

[1] John Ray Wallace died on August 26, 2012 and his daughter, Tanajae Raychelle Wallace was substituted as the
Plaintiff.  (R. at 7-17).  However, we will continue to refer to Mr. Wallace as the Plaintiff.

benefits, claiming a complete inability to work as of February 28, 2009, due to a herniated disc, high blood pressure, and diabetes. (R. at 141-153, 178).[2] His applications were denied (R. at 83-84, 87-110), and having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 9, 11).

2.      General Background

Plaintiff was thirty seven years old on the date of the ALJ's decision and has a high school education. (R. at 37). Plaintiff's job history included employment as a cook in a fast food restaurant and laborer. (R. at 48, 180).

3.      Treatment History

One month prior to his alleged disability onset date, Plaintiff presented to the emergency room on January 12, 2009 and reported that he had been injured in a car accident and suffered abdominal contusions and chest injuries. (R. at 305-310). Mild tenderness of his left upper quadrant was found on physical examination, but his remaining physical examination was unremarkable. (R. at 305-306). Plaintiff exhibited a normal range of back motion with no tenderness found. (R. at 306). Plaintiff's chest and hip x-rays revealed normal findings. (R. at 355-356). A CT scan of Plaintiff's abdomen revealed the presence of a nodule on his liver. (R. at 355). Plaintiff was prescribed Vicodin for pain and was instructed to follow up with his physician for the possible liver lesion. (R. at 309-310).

Plaintiff followed up at Conneaut Valley Health Center on January 29, 2009. (R. at 343). Plaintiff's ribs were tender on physical examination, and he was diagnosed with, *inter alia*, rib contusions. (R. at 343). On February 19, 2009, Plaintiff reported he was doing "ok." (R. at 342). On September 24, 2009, Plaintiff complained of left rib pain, and tenderness was noted on

---

[2] References to the administrative record (ECF No. 6), will be designated by the citation "(R. at ___)".

physical examination.  (R. at 341).  He further complained of right shoulder pain, and exhibited a reduced range of motion.  (R. at 341).

On December 1, 2009, Plaintiff complained of back pain and reported a history of a herniated disc suffered in 2006.  (R. at 339).  Plaintiff was subsequently hospitalized for three days in December 2009 for complaints of abdominal pain.  (R. at 282-285).  He was diagnosed with diabetic ketoacidosis, acute pancreatitis, hypertriglyceridemia, and type 2 diabetes mellitus, new onset.  (R. at 282).  Plaintiff's blood pressure was well controlled on admission.  (R. at 283).  A CT scan of his abdomen revealed mild edema over the peripancreatic area suggesting pancreatitis.  (R. at 282, 301).  His diabetic ketoacidosis resolved with treatment.  (R. at 283).  Plaintiff was discharged in stable condition with new medications to manage his diabetes and instructed to check his blood sugar levels twice daily.  (R. at 284).  He was also prescribed Vicodin for pain for five days only.  (R. at 284).  When Plaintiff returned to Conneaut Valley Health Center for follow-up on December 28, 2009, his medications were adjusted.  (R. at 337).

Plaintiff presented to the emergency room on February 9, 2010 and reported that he had fallen on icy stairs at home, twisting his right knee and back.  (R. at 346).  Physical examination revealed mild soft-tissue tenderness in the right lumbar area with no vertebral tenderness found.  (R. at 346).  Examination of Plaintiff's right knee revealed mild tenderness and swelling, and some limited range of motion secondary to pain.  (R. at 346).  X-rays of Plaintiff's right knee and lumbar spine were normal.  (R. at 324, 345).  He was prescribed Vicodin, Naproxen, and Flexeril on an as-needed basis.  (R. at 347).  He received chiropractic treatment for his complaints of low back pain on three occasions from February 19, 2010 through March 16, 2010.  (R. at 321-322).

Plaintiff began treatment with Stuart Shapiro, M.D. on March 17, 2010 and reported a history of hypertension, diabetes, asthma, and back problems.  (R. at 362).  Plaintiff reported a

history of a herniated disc, for which he had been referred to a surgeon and undergone chiropractic therapy. (R. at 362). He reported pain radiating down his left leg and occasionally his right leg that increased upon lifting. (R. at 362). Plaintiff indicated that he had applied for disability because he could no longer perform his factory job. (R. at 362). Plaintiff further reported that he previously twisted his knee and had varying degrees of pain and swelling. (R. at 362). Dr. Shapiro assessed him with diabetes, hypertension, and back and knee pain. (R. at 363). He continued Plaintiff on his medications, and recommended an MRI of Plaintiff's knee and possibly an orthopedic evaluation. (R. at 363).

Plaintiff continued to be bothered by back and knee pain on April 1, 2010. (R. at 432). Dr. Shapiro refilled his medications and ordered an MRI of Plaintiff's right knee. (R. at 432). An MRI of Plaintiff's right knee dated April 12, 2010 was unremarkable. (R. at 367).

On May 21, 2010, Plaintiff was evaluated by Robert Woods, D.O. upon referral by Dr. Shapiro for his complaints of right knee and back pain. (R. at 381). Dr. Woods noted that Plaintiff's knee x-rays and lumbar x-rays were unremarkable. (R. at 381). On physical examination, Dr. Woods found Plaintiff had a good range of right knee motion with mild crepitus, slight pain with forced extension, his ligaments were stable, there was no joint line tenderness, and no swelling. (R. at 381). Plaintiff's straight leg raising test was negative bilaterally, although he had some lower back pain. (R. at 381). Plaintiff had tenderness in the lower lumbar regions bilaterally, and pain was elicited on forward flexion and side bending. (R. at 381). Plaintiff was neurovascularly intact in in his lower extremities. (R. at 381). Plaintiff reported that he had constant stiffness and had not seen a chiropractor in some time. (R. at 381). Dr. Woods referred him to a chiropractor for instruction in a home exercise program. (R. at

381). He diagnosed Plaintiff with right knee and low back pain, and found he had a good prognosis. (R. at 381).

Plaintiff returned to Dr. Shapiro on June 1, 2010 and reported bilateral swelling in his lower extremities. (R. at 431). Plaintiff's blood pressure was slightly elevated, but he reported that his home readings had been "good." (R. at 431). Trace edema was found on physical examination, but his pulses and circulation were intact. (R. at 431). He was diagnosed with peripheral edema/hypertension and was continued on his medication regimen. (R. at 431).

On June 14, 2010, Gail Sekas, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and/or walk for a total of six hours in an 8-hour workday, sit for about six hours in an 8-hour workday, and was limited in pushing and pulling activities in his lower extremities. (R. at 383). She further found Plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl, but should avoid concentrated exposure to extreme temperatures, vibrations, fumes, odors, dusts, gases, and hazards such as machinery and heights. (R. at 384-385). In support of her conclusion, Dr. Sekas reviewed Plaintiff's diagnostic studies, the treatment note entries and findings on physical examination by Plaintiff's treating physicians, and Plaintiff's course of treatment for his alleged impairments. (R. at 387). Dr. Sekas noted that his diabetes and asthma were controlled with medication, and he had not been treated by a specialist for these impairments or his hypertension. (R. at 387-388). She further noted that although Plaintiff had pain, his daily activities were not as limited as alleged, and he did not use an assistive device to walk or a TENS unit. (R. at 388). Finally, she observed that while Plaintiff had been prescribed narcotic pain medication, there had been

significant periods of time during which Plaintiff had not taken any medication despite his claims of persistent symptoms.  (R. at 388).

On June 25, 2010, Plaintiff underwent a consultative examination performed by Kreig Spahn, D.O.  (R. at 406-409).  Plaintiff complained of constant lower back pain radiating into his right leg.  (R. at 406).  Dr. Spahn reported that Plaintiff had a cautious, slow gait with a right-sided limp; trace edema bilaterally; right lower paraspinal tenderness; reduced strength and reflexes in his lower extremities; and reduced sensation to touch in his right leg.  (R. at 408-409).  Dr. Spahn diagnosed the Plaintiff with well-controlled hypertension, uncomplicated diabetes, lumbar disc displacement, and well-controlled asthma.  (R. at 409).

Dr. Spahn assessed Plaintiff's ability to perform work-related physical activities, opining that Plaintiff could frequently lift and carry up to ten pounds and occasionally lift and carry up to twenty pounds, stand for one hour or less in an 8-hour workday, sit for two hours in an 8-hour workday, and was unlimited in his pushing and pulling ability.  (R. at 401).  Dr. Spahn further opined that Plaintiff could never perform postural activities.  (R. at 402).

Plaintiff returned to Dr. Shapiro on August 10, 2010 and continued to complain of knee and back pain.  (R. at 428).  Dr. Shapiro reported that Plaintiff's knee MRI was normal and Dr. Woods felt there was nothing wrong with his knee.  (R. at 428).  Dr. Shapiro indicated that "[w]ith a normal exam and a normal MRI and orthopedic consultation, there [was] nothing more to do."  (R. at 428).  He explained to Plaintiff that his knee should not "limit him to any major degree."  (R. at 428).  With respect to his back pain, Plaintiff reported that chiropractic therapy helped with his symptoms, but his medical card would not pay for it.  (R. at 429).  Plaintiff further indicated that he had not followed through with a recommended surgical consultation because his symptoms improved.  (R. at 428).  Dr. Shapiro reported that Plaintiff's diabetes had

improved, and he continued his hypertension medications. He ordered an MRI for Plaintiff's complaints of back pain. (R. at 428). Plaintiff discussed applying for disability, but Dr. Shapiro stated that questions would be asked relative to the Plaintiff's ability to get up and down from chairs and exam tables, and Plaintiff's ability in this area was normal. (R. at 428). Dr. Shapiro further stated that "it was very unlikely that any of his health problems would make him permanently disabled." (R. at 428).

On November 12, 2010, Dr. Shapiro increased Plaintiff's blood pressure medication. Dr. Shapiro reported that Plaintiff's back pain was primarily in his lower back with no radiation. (R. at 427). Dr. Shapiro noted that Plaintiff's insurance would not approve an MRI until he completed physical therapy, and he encouraged Plaintiff to proceed with therapy. (R. at 427).

On December 13, 2010, Plaintiff reported that he had some back pain issues, and had an appointment with a pain specialist recommended by his girlfriend. (R. at 426). Plaintiff had not undergone recommended physical therapy. (R. at 426). Plaintiff's physical examination was unremarkable. (R. at 426). Dr. Shapiro noted that Plaintiff's 2007 MRI showed some abnormalities, but informed Plaintiff that treatment decisions could not be made on a four year old study. (R. at 426).

On December 17, 2010, Plaintiff was seen by O. Taiwo, M.D., a pain management specialist. (R. at 414-415). Plaintiff reported a four year history of low back pain that increased upon standing or walking. (R.at 414). Physical examination revealed pain on extension and flexion of the lumbar spine and tenderness was found in the paraspinal muscles. (R. at 415). Plaintiff's straight leg raising test was negative, his lower extremity reflexes were intact, and he had no motor or sensory deficits. (R. at 415). Dr. Taiwo noted that a lumbar spine MRI dated January 19, 2007 revealed multilevel degenerative disc disease, moderate disc herniation at the

L1-2 level, and annular disc bulge at L3-4 and L4-5. (R. at 415). Dr. Taiwo administered a lumbar epidural steroid injection. (R. at 415).

Plaintiff returned to Dr. Taiwo on January 10, 2011 and reported "significant" relief following injection therapy, although he reported "nagging" back pain. (R. at 413). Dr. Taiwo administered an epidural steroid injection. (R. at 413).

On March 14, 2011 Plaintiff again reported significant relief but complained of dull low back pain. (R. at 412). Plaintiff received an epidural steroid injection. (R. at 412). By March 28, 2011, Plaintiff exhibited mild back tenderness and Dr. Taiwo reported that Plaintiff was able to function much better. (R. at 411). Plaintiff used Vicodin and Aleve on an as-needed basis. (R. at 411). Dr. Taiwo recommended he continue these medications, and suggested physical therapy. (R. at 411).

Plaintiff returned to Dr. Shapiro on April 13, 2011 and complained of back pain. (R. at 423). He stated that injection therapy only helped for a few days, and that Dr. Taiwo recommended he undergo physical therapy. (R. at 423). Plaintiff further stated that he had good days and bad days, and averaged three pain pills a day. (R. at 423). Plaintiff reported that he had been unable to participate in physical therapy due to family issues, but was planning to do so. (R. at 423). Dr. Shapiro observed that once Plaintiff completed physical therapy he would be able to undergo an MRI. (R. at 423). Dr. Shapiro informed Plaintiff that he was young enough that "just taking pain medicines and putting up with [pain was] not a good option." (R. at 423). With respect to his diabetes, he advised Plaintiff to keep a record of his sugar levels and recommended weight loss. (R. at 423).

Plaintiff was hospitalized for three days in August 2011 for complaints of chest pain. (R. at 433-467). Plaintiff's diagnostic testing revealed normal results, and he was diagnosed with

unstable angina, resolved.  (R. at 443, 448-453).  It was noted that his diabetes and hypertension were controlled, and he was discharged with instructions to follow up with his primary care physician.  (R. at 443).

On August 18, 2011, Dr. Shapiro completed a Medical Source Statement regarding the nature and severity of the Plaintiff's physical impairments.  (R. at 468-470).  Dr. Shapiro opined that Plaintiff could frequently/occasionally lift and carry ten pounds, and stand/walk one to three hours in an eight hour workday, with an unlimited ability to sit.  (R. at 468-469).  Dr. Shapiro further opined that Plaintiff was limited in his pushing and pulling abilities with his upper and lower extremities, and could occasionally perform postural activities such as climbing, balancing, kneeling, crouching, crawling, and stooping.  (R. at 469).  Dr. Shapiro indicated that Plaintiff would likely miss two out of five days per week, be unable to complete a full work day two out of five days per week, and would be "medically required" to take one to four unscheduled breaks in excess of five to ten minutes throughout the day due to his impairments.  (R. at 470).

Plaintiff returned to Dr. Shapiro on August 22, 2011, and denied any further chest discomfort following his discharge from the hospital.  (R. at 417).  He reported that back pain remained a major problem for him.  (R. at 417).  He stated that he was unable to attend physical therapy since he did not have transportation.  (R. at 417).  Dr. Shapiro reported that Plaintiff was uncomfortable secondary to back pain.  (R. at 417).  Plaintiff's remaining physical exam was unremarkable.  (R. at 417).  Dr. Shapiro noted that Plaintiff was to continue with physical therapy and then depending on his progress, decisions with respect to an MRI could be made.  (R. at 418).  He continued Plaintiff on his medication regimen.  (R. at 417-418).

4. <u>Administrative Hearing</u>

Plaintiff testified at the hearing held by the ALJ that he lived with his aunt and one son. (R. at 50-51). He testified that he was on medication for diabetes and watched his diet. (R. at 63). He checked his blood sugar levels three times a day and if it was high he took insulin. (R. at 52, 64). He testified that he would rest for one half hour after taking insulin and then repeat the process if his blood sugar level remained high. (R. at 64-65). Plaintiff indicated that he also suffered from back problems since 2006. (R. at 53). He claimed he had back spasms across his lower back, and had radiating pain down his right leg once or twice a week. (R. at 62-63). He was unable to take a bath but was able to shower. (R. at 63). He claimed his feet became swollen after prolonged sitting, and he wore slippers all day. (R. at 58, 63). Plaintiff testified that he had high blood pressure, which he checked three to four times a day. (R. at 54).

Plaintiff testified that he spent his days in a recliner with his feet elevated, and alternated between sitting and standing. (R. at 56-57). He was able to drive to appointments, but did not shop for groceries or perform household chores. (R. at 55-56). He claimed driving or riding in a car caused back stiffness. (R. at 66). Plaintiff watched television and played games such as poker on a laptop computer. (R. at 56). Plaintiff testified that he was able to lift ten pounds and stand for ten minutes. (R. at 56-57).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was limited to sedentary work, with the ability to lift and carry ten pounds occasionally, and who could sit for eight hours, and stand or walk for four hours, with a sit/stand option every thirty minutes. (R. at 67-68). The hypothetical individual could not work at unprotected heights or around dangerous machinery, and could not engage in pushing or pulling activities with his lower extremities. (R. at 68). The hypothetical individual could

engage in occasional bending or stooping, but no crawling, and was limited to simple, repetitive non-production job tasks. (R. at 68). The vocational expert testified that such an individual could perform the jobs of a ticket sales worker and telephone information clerk. (R. at 68-69).

**B.    ANALYSIS**

1.    Standard of Review

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that the Plaintiff met the disability insured status requirements of the Act through September 30, 2013. (R. at 32). SSI does not have an insured status requirement.

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-5 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based;

---

[3] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

the court will review the record as a whole.  *See* 5 U.S.C. §706.  The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact.  *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion.  *Ventura v. Shalala,* 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).  If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390.  When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered.  *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947).  The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97.  Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d. Cir. 1986).

2.  Discussion

The ALJ found that Plaintiff's obesity, degenerative disc disease status post injury, diabetes mellitus, and arthritis of the right knee were severe impairments, but determined at step three that he did not meet a listing.  (R. at 32-34).  The ALJ found that Plaintiff had the residual functional capacity to perform work at the sedentary level with the following restrictions: he was

limited to lifting ten pounds occasionally; he could stand/walk for four hours in an eight hour workday when allowed to alternate sitting every thirty minutes; could occasionally bend and stoop; could perform activities that did not involve crawling, or pushing/pulling with his lower extremities; could not perform climbing; could not perform work requiring him to work around unprotected heights or dangerous machinery or equipment; and was limited to simple, routine, repetitive, non-productive tasks. (R. at 34). At the final step, the ALJ concluded that Plaintiff could perform the jobs of a ticket sales worker and telephone information clerk. (R. at 38). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff's challenges relate to the ALJ's evaluation of the opinion evidence in determining his residual functional capacity ("RFC"). "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a); 416.945(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001). Moreover, the ALJ's RFC finding must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Id*. (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).

Plaintiff raises the following challenges to the ALJ's evaluation of the opinion evidence: (1) the ALJ failed to assign controlling weight to the opinion of his treating physician, Dr. Shapiro; (2) the ALJ erred in assigning minimal weight to the opinion of Dr. Spahn, the consulting examiner; and (3) the ALJ erred in assigning moderate weight to the opinion of Dr. Sekas, the state agency reviewing physician. *See* (ECF No. 10 at 11-14). At the outset, we note that "[a] cardinal principle guiding disability determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994). As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Massanari,* 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v.*

*Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Therefore, the ALJ may choose to reject a treating physician's opinion if it conflicts with other medical evidence and the ALJ explains his reasons for doing so.

Here, we find that the ALJ adhered to the above standards in his evaluation of Dr. Shapiro's opinion. Contrary to Plaintiff's argument, the ALJ did, in fact, credit a majority of the limitations found by Dr. Shapiro in his report of August 18, 2011 in fashioning Plaintiff's RFC, assigning it "significant weight." (R. at 37). For example, the ALJ adopted the limitations regarding lifting and sitting, as well as the restrictions with respect to certain postural maneuvers. (R. at 34, 468-469). The ALJ rejected Dr. Shapiro's opinion that Plaintiff could only stand for one hour and would miss two days of work per week due to pain and fatigue, however, since it was inconsistent with the other evidence in the record. Specifically, the ALJ found:

> These findings are given minimal weight because they are not consistent with the other physical limitations he reported, with the findings from examinations, with the reported improvement in the claimant's pain with treatment or with the conservative course of treatment the claimant has received … .

(R. at 37).

As noted by the ALJ, Dr. Shapiro's limitations in this regard were not consistent with the remainder of his opinion wherein he found that Plaintiff could lift ten pounds, walk for three hours, sit without limitation, and perform occasional postural activities. Dr. Shapiro's limitations also far exceeded the physical findings in the record. In his discussion of the medical evidence, the ALJ noted that in January 2009 no tenderness was found in Plaintiff's back, and x-rays of his lumbar spine from February 2010 were normal. (R. at 35, 305-306, 345). Although Plaintiff reported pain in May 2010, his straight leg raising test was negative bilaterally. (R. at 35, 381). In December 2010, Dr. Taiwo reported that Plaintiff's straight leg raising test was negative, his lower extremity reflexes were intact, and he had no motor or sensory deficits. (R. at 415).

16

Dr. Shapiro's opinion is undercut by the treatment note entries that document Plaintiff's improvement with treatment. Plaintiff reported to Dr. Shapiro in August 2010 that chiropractic therapy had helped his symptoms, and he had not followed through with a recommended surgical consultation because his symptoms had improved. (R. at 428). Plaintiff also reported significant relief in his symptoms following epidural injections in January and March 2011, and Dr. Taiwo reported that Plaintiff was able to function much better. (R. at 36, 411, 412-413).

Finally, the ALJ noted Plaintiff's conservative course of treatment, observing that Plaintiff did not use an assistive device to walk, had not required surgery, and had not always used narcotic medications for his pain. (R. at 36). Because the ALJ appropriately considered Dr. Shapiro's opinion and gave substantial weight to those limitations supported by the medical and other evidence, we conclude that substantial evidence supports the ALJ's decision not to afford controlling weight to his opinion in its entirety.

We further reject the Plaintiff's contention that the ALJ should have recontacted Dr. Shapiro "to determine the basis" for his opinion that Plaintiff would be absent from work due to his impairments. The Commissioner's regulations provide that an ALJ must recontact a medical source "when the report from [Plaintiff's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (quoting 20 C.F.R. § 416.912(e)(1)).[5] Recontact is only required however, when "the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are

---

[5] The SSA eliminated this provision and § 404.1512(e)(1), effective March 26, 2012. *See generally* How We Collect and Consider Evidence of Disability, 77 Fed.Reg. 10,651 (Feb. 23, 2012). The new protocol for recontacting medical sources is set forth in 20 C.F.R. §§ 404.1520b, 416.920b. *See Gray v. Astrue*, 2012 WL 1521259 at *3 n.1 (E.D.Pa. 2012).

disabled." *Id*. Here, the record was sufficiently developed for the ALJ to make a disability determination. Simply because the ALJ rejected one portion of Dr. Shapiro's opinion on the basis it was not supported by his physical examination findings and the Plaintiff's treatment history does not mean the ALJ was required to recontact Dr. Shapiro. Consequently, we conclude that the ALJ did not err in failing to recontact Dr. Shapiro to determine the "basis" of his opinion.

Plaintiff further claims the ALJ erred in rejecting Dr. Spahn's opinion, the consulting examiner. With respect to Dr. Spahn's opinion, we note that the treating physician rule does not apply to a consulting physician's opinion. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (doctrine had no application to physician who examined claimant once). The Commissioner's regulations do acknowledge that, as a general principal, opinions from examining sources are given more weight than opinions from non-examining sources. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). The regulations do not require however, that in every case, an examining physician's medical opinion must be favored over that of a non-examining physician. Instead, the Commissioner considers a number of competing factors, such as, *inter alia*, the extent to which the opinion is supported by a logical explanation and the extent to which the source's opinion is consistent with the entirety of the evidence. *See generally* 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

The ALJ addressed Dr. Spahn's opinion and explained why he gave the opinion reduced weight. (R. at 37). Specifically, the ALJ noted that Dr. Spahn only examined the Plaintiff on one occasion, and the other medical evidence of record, including the objective physical examination findings, (without repeating such findings here), did not support the extreme limitations imposed by Dr. Spahn. (R. at 37). The ALJ also noted that Dr. Spahn's restrictions

were inconsistent with Plaintiff's conservative course of treatment. (R. at 37). All of these findings are supported by substantial evidence and we find no error in this regard.

Plaintiff's final contention that the ALJ erred in according Dr. Sekas' opinion moderate weight is unavailing. It is well-settled that the findings of a non-examining physician may be substantial evidence defeating contrary opinions. State agency medical consultants are "highly qualified physicians … who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i); 416.927(f)(2)(i); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("state agency opinions merit significant consideration"); *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) (ALJ did not err in rejecting opinion of treating physician in favor of opinions from state agency physicians where treating physicians' opinions were conclusory and unsupported by the medical evidence); *Harris v. Astrue*, 2009 WL 2342112 at *7 (E.D.Pa. 2009) (when consistent with the record, ALJ is entitled to rely on state agency physician's opinion even if contradicted by opinions of treating physician). Therefore, the ALJ was entitled to rely upon Dr. Sekas' opinion in evaluating Plaintiff's RFC.

We further reject the Plaintiff's argument that the ALJ's reliance on Dr. Sekas' opinion was improper because Dr. Sekas did not "have the full record to review" when she rendered her assessment. The Third Circuit has specifically addressed this issue, stating: "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no time limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler*, 667 F.3d at 361 (finding that the ALJ properly relied on records that were "a few years old").

Finally, the ALJ did not rely solely on Dr. Sekas' opinion in fashioning the Plaintiff's RFC. Rather, the ALJ reviewed and considered the Plaintiff's testimony, examined the medical records and discussed the findings contained therein, and considered his course of treatment in fashioning his RFC. The ALJ expressly declined to assign great weight to Dr. Sekas' opinion, finding that Plaintiff's back pain, knee pain and obesity prevented him from lifting as much as twenty pounds and from standing as long as six hours without alternating sitting and standing. (R. at 36). It is apparent from the ALJ's decision that he did not simply accept or "rubber stamp" the opinion of Dr. Sekas in assessing the Plaintiff's RFC and accordingly, we find no error in this regard.

### C.   CONCLUSION

Based upon the foregoing, we conclude that the ALJ's findings were supported by substantial evidence and he complied with applicable law. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (ECF No. 9) be denied, Defendant's Motion for Summary Judgment (ECF No. 11) be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

March 14, 2014

*s/ Susan Paradise Baxter*
Susan Paradise Baxter
United States Magistrate Judge

cc/ecf: All counsel of record.